UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MARCO GUZMAN,

      Petitioner,

      v.

WILLIAM GITTERE, *et al.*,

      Respondents.

Case No. 3:17-cv-00515-HDM-CLB

**ORDER**

## I.    SUMMARY

This action is a petition for a writ of habeas corpus by Marco Guzman, an individual incarcerated at Nevada's Ely State Prison. Guzman is represented by appointed counsel. The case is before the Court for resolution of Guzman's claims on their merits. The Court will deny Guzman's petition and will deny him a certificate of appealability.

## II.    BACKGROUND

Guzman was convicted in 2012, following a jury trial, in Nevada's Eighth Judicial District Court (Clark County), of one count of second-degree murder with use of a deadly weapon and one count of first-degree murder with use of a deadly weapon. *See* Judgment of Conviction, Exh. 15 (ECF No. 14-15). For the second-degree murder, Guzman was sentenced to life in prison with the possibility of parole after 120 months plus a consecutive term of 12 to 240 months for use of the deadly weapon; for the first-degree murder, he was sentenced to life in prison with the possibility of parole after 240 months plus a consecutive term of 12 to 240 months for use of the deadly weapon. *See id.* The sentences for the two murders are to be served consecutively. *See id.*

Guzman appealed. *See* Appellant's Opening Brief, Exh. 16 (ECF No. 14-16); Appellant's Reply Brief, Exh. 18 (ECF No. 15-2). The Nevada Supreme Court affirmed on October 29, 2014. *See* Order of Affirmance, Exh. 19 (ECF No. 15-3).

On December 16, 2014, Guzman filed a counseled petition for writ of habeas corpus in the state district court. Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 21 (ECF No. 15-5). The court conducted an evidentiary hearing (*see* Transcript, Exh. 74 (ECF No. 24-41)) and denied Guzman's petition in a written order filed February 10, 2016. *See* Findings of Fact, Conclusions of Law and Order, Exh. 25 (ECF No. 15-9, pp. 3–7). Guzman appealed. *See* Appellant's Opening Brief, Exh. 26 (ECF No. 15-10); Appellant's Reply Brief, Exh. 28 (ECF No. 15-12). The Nevada Supreme Court affirmed the denial of Guzman's petition on June 15, 2017. *See* Order of Affirmance, Exh. 29 (ECF No. 15-13).

This Court received from Guzman a *pro se* petition for writ of habeas corpus (ECF No. 4) initiating this action on August 25, 2017. The Court granted Guzman's motion for appointment of counsel and appointed counsel to represent him. *See* Order entered August 31, 2017 (ECF No. 3). With counsel, Guzman filed a first amended petition on April 2, 2018 (ECF No. 13) and a second amended petition on June 18, 2018 (ECF No. 27). Respondents filed a motion to dismiss Guzman's second amended petition (ECF No. 28), and Guzman filed a related motion for leave to conduct discovery (ECF No. 33). Both of those motions were denied without prejudice after Guzman indicated he would request a stay to further exhaust claims in state court. *See* Order entered February 19, 2019 (ECF No. 40). Guzman filed a motion for stay (ECF No. 41), and the Court granted that motion and stayed the action on June 6, 2019, pending state-court proceedings. *See* Order entered June 6, 2019 (ECF No. 44).

On May 10, 2019, Guzman filed a petition for writ of habeas corpus in the state district court, initiating a second state habeas action. *See* Petition for Writ of Habeas Corpus, Exh. 37 (ECF No. 48-1). On August 13, 2019, the state district court denied Guzman's petition, ruling that all his claims were procedurally barred. *See* Findings of

Fact, Conclusions of Law, and Order, Exh. 43 (ECF No. 48-7). Guzman appealed. *See*

Appellant's Opening Brief, Exh. 45 (ECF No. 48-9); Appellant's Reply Brief, Exh. 47

(ECF No. 48-11). On November 3, 2020, the Nevada Supreme Court affirmed. *See*

Order of Affirmance, Exh. 53 (ECF No. 48-17).

The stay of this action was lifted on January 19, 2021 (ECF No. 54), and

Guzman filed a third amended petition for writ of habeas corpus (ECF No. 55).

Guzman's third amended habeas petition, now his operative petition, includes the

following claims:

> Ground 1: Guzman's federal constitutional rights were violated because "[t]rial counsel conceded Mr. Guzman was guilty of second degree murder."

> Ground 2: Guzman's federal constitutional rights were violated because the State presented insufficient evidence to convict him of murder.

>> Ground 2A: "Mr. Guzman is guilty only of voluntary manslaughter" for the killing of Anthony ("Tony") Dickerson.

>> Ground 2B: "Mr. Guzman is guilty only of voluntary manslaughter" for the killing of Tameron ("Tammy") Clewis.

> Ground 3: Guzman's federal constitutional rights were violated on account of ineffective assistance of counsel because his appellate counsel "fail[ed] to argue the State presented insufficient evidence to convict Mr. Guzman of first degree murder regarding Tammy."

> Ground 4: Guzman's federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel failed to seek an advisory verdict, a directed verdict, or judgment notwithstanding the verdict.

> Ground 5: Guzman's federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel "conced[ed] Mr. Guzman was guilty of second degree murder."

> Ground 6: Guzman's federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel failed to consult with and hire expert witnesses.

>> Ground 6A: "Trial counsel should've called a physician to discuss Mr. Guzman's hand injury."

>> Ground 6B: "Trial counsel should've called a self-defense expert."

>> Ground 6C: "Trial counsel should've called an expert regarding meth."

Ground 7: Guzman's federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel failed to challenge Jury Instruction 26.

Ground 8: Guzman's federal constitutional rights were violated because "[j]ury instruction 26 was fundamentally unfair."

Ground 9: Guzman's federal constitutional rights were violated because "[t]rial counsel failed to communicate a favorable plea offer to Mr. Guzman."

Ground 10: Guzman's federal constitutional rights were violated because "[t]he State failed to disclose material exculpatory information regarding its key witness and allowed that witness to testify falsely."

Ground 11: Guzman's federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel "fail[ed] to investigate and present evidence regarding whether the State extended a favorable deal to a witness."

Third Amended Petition for Writ of Habeas Corpus (ECF No. 55), pp. 10–30.

Respondents filed a motion to dismiss on July 27, 2021 (ECF No. 63) contending that all of Guzman's claims are procedurally defaulted and that Ground 9 is inadequately pled and conclusory. Along with his opposition to the motion to dismiss (ECF No. 69), Guzman filed a motion for leave to conduct discovery (ECF No. 70). The Court denied the motion to dismiss in all respects on February 24, 2022 (ECF No. 74). With six exceptions, the Court's ruling on the defenses asserted by Respondents—that all Guzman's claims are procedural defaulted and that one of his claims fails because it is inadequately pled and conclusory—was deferred until after Respondents filed an answer and Guzman a reply. The exceptions involved the question of the procedural default of the claims in Grounds 1, 2A, 5, 6A, 6B and 6C; the Court determined that those claims are not procedurally defaulted because they were ruled upon by the Nevada Supreme Court on their merits. The Court denied Guzman's motion for leave to conduct discovery, without prejudice, in all respects.

Respondents filed their answer on December 2, 2022 (ECF No. 84). Guzman filed his reply on June 5, 2023 (ECF No. 92). On that date, Guzman also filed a motion for leave to conduct discovery (ECF No. 93) and a motion for evidentiary hearing (ECF No. 94). On September 20, 2023, Respondents filed oppositions to Guzman's motion

1  for leave to conduct discovery and motion for evidentiary hearing (ECF Nos. 98, 99).

2  Respondents filed a response to Guzman's reply on September 29, 2023 (ECF No.

3  102). And, on October 10, 2023, Guzman filed replies in support of his two motions

4  (ECF Nos. 103, 104).

5  **III.   DISCUSSION**

6      **A.   Legal Standards**

7          **1.   Standard of Review - Claims Adjudicated in State Court**

8  28 U.S.C. § 2254(d), enacted as part of the Antiterrorism and Effective Death

9  Penalty Act of 1996 (AEDPA), sets forth the standard of review generally applicable to

10  claims asserted and resolved on their merits in state court:

11  
12  
13  

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

14  

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

15  
16  

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

17  

18  28 U.S.C. § 2254(d).

19  A state court decision is contrary to clearly established Supreme Court

20  precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a

21  rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the

22  state court confronts a set of facts that are materially indistinguishable from a decision

23  of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme

24  Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v.*

25  *Taylor*, 529 U.S. 362, 405–06 (2000)).

26  A state court decision is an unreasonable application of clearly established

27  Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state

28  court identifies the correct governing legal principle from [the Supreme Court's]

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409). The analysis under § 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has explained that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## 2. Legal Standards - Exhaustion and Procedural Default

A federal court may not grant relief on a habeas corpus claim not exhausted in state court. 28 U.S.C. § 2254(b). The exhaustion doctrine is based on the policy of federal-state comity, and is designed to give state courts the initial opportunity to correct alleged constitutional deprivations. *See Picard v. Conner*, 404 U.S. 270, 275 (1971). To exhaust a claim, a petitioner must fairly present that claim to the highest available state court and must give that court the opportunity to address and resolve it. *See Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).

In *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), the Supreme Court held that a state prisoner who fails to comply with the State's procedural requirements in

presenting his claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. *Coleman*, 501 U.S. at 731–32 ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause, to overcome the procedural default of a claim of ineffective assistance of trial counsel. In *Martinez*, the Supreme Court noted that it had previously held, in *Coleman*, that "an attorney's negligence in a postconviction proceeding does not establish cause" to excuse a procedural default. *Martinez*, 566 U.S. at 15 (citing *Coleman*, 501 U.S. at 746–47). The *Martinez* Court, however, "qualif[ied] *Coleman* by recognizing a narrow exception: inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a

prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. at 9. The *Martinez* Court stated:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id*. at 17.

### B.    Guzman's Claims

#### 1.    Grounds 1 and 5 - Counsel's Alleged Concession

In Ground 1, Guzman claims that his federal constitutional rights were violated because "[t]rial counsel conceded Mr. Guzman was guilty of second degree murder." Third Amended Petition (ECF No. 55), pp. 10–12. Guzman claims that the concession violated his federal constitutional rights under the United States Supreme Court's holding in *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018). *See id*. Ground 5 is a related claim of ineffective assistance of trial counsel; Guzman claims that his federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel "conced[ed] Mr. Guzman was guilty of second degree murder." *Id*. at 17–18.

In the ruling on Respondents' motion to dismiss, the Court determined that Grounds 1 and 5 are not procedurally defaulted because the Nevada Supreme Court ruled on those claims on their merits. Order entered February 24, 2022 (ECF No. 74), pp. 7–8, 11. Therefore, the Court applies the AEDPA standard of review to both claims.

Guzman bases his claim in Ground 1 on the holding of the Supreme Court in *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018). *See* Third Amended Petition for Writ of Habeas Corpus (ECF No. 55), pp. 10–1; *see also* Reply (ECF No. 92), pp. 6–13 ("… Ground One is a meritorious *McCoy* claim." (p. 9, line 7)). The Court determines that this claim is fundamentally flawed, however, because the Ninth Circuit Court of Appeals has held that the Supreme Court's holding in *McCoy* does not apply retroactively to cases on collateral review. *Christian v. Thomas*, 982 F.3d 1215,

1223–25 (9th Cir. 2020). Guzman was convicted in 2012, and the Nevada Supreme

Court affirmed his conviction in 2014. *See* Order of Affirmance, Exh. 19 (ECF No. 15-3).

The Supreme Court decided *McCoy* on May 14, 2018, while this federal habeas corpus

action was pending. That was long after Guzman's judgment became final. As *McCoy*

does not apply retroactively to cases on collateral review, Ground 1 does not state a

claim upon which federal habeas corpus relief could be granted. The Court will therefore

deny Guzman habeas corpus relief with respect to Ground 1.

Turning to the claim of ineffective assistance of trial counsel in Ground 5, the

Nevada Supreme Court's ruling on that claim, on the appeal in Guzman's first state

habeas action, was as follows:

> … Guzman contends that counsel was ineffective because he
> conceded Guzman's guilt during closing argument after Guzman testified
> that he acted in self-defense. We disagree. Counsel argued that Guzman
> acted in self-defense but also argued that, in the alternative, Guzman's
> actions constituted second-degree murder or voluntary manslaughter
> rather than first-degree murder. This strategy is entitled to deference and
> was reasonable under the circumstances. *See Armenta-Carpio v. State*,
> 129 Nev. 531, 535, 306 P.3d 395, 398 (2013) (recognizing that "[a]
> concession of guilt is simply a trial strategy—no different than any other
> strategy the defense might employ at trial" and counsel's decision should
> be reviewed for reasonableness); *Doleman v. State*, 112 Nev. 843, 848,
> 921 P.2d 278, 280-81 (1996) (observing that strategic decisions are
> virtually unchallengeable under most circumstances). [Footnote: This case
> is distinguishable from *Jones v. State*, 110 Nev. 730, 877 P.2d 1052
> (1994), because counsel did not undermine Guzman's testimony or
> suggest that his testimony was completely untruthful; counsel simply
> acknowledged that Guzman's actions might not meet the legal definition of
> self-defense under the circumstances. Therefore, even assuming that
> *Jones* remains good law, *see Armenta-Carpio*, 129 Nev. at 536 n.1, 306
> P.3d at 399 n.1, no relief is warranted.] Accordingly, we conclude that the
> district court did not err by denying this claim.

Order of Affirmance, Exh. 29, pp. 1–2 (ECF No. 15-13, pp. 2–3).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court

established a two-prong test for claims of ineffective assistance of counsel: the

petitioner must demonstrate (1) that the attorney's representation "fell below an

objective standard of reasonableness," and (2) that the attorney's deficient performance

prejudiced the defendant such that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See Strickland*, 466 U.S. at 697.

Where a state court previously adjudicated a claim of ineffective assistance of counsel under Strickland, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the Supreme Court explained that, in such cases, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential … and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (2010) (double deference required with respect to state court adjudications of *Strickland* claims).

Guzman parses his trial counsel's closing argument in an attempt to show that the Nevada Supreme Court's ruling on the claim in Ground 5 was unreasonable, but in doing so he takes parts of counsel's argument out of context and distorts the gist of the argument as a whole.

In his closing argument, trial counsel argued that Guzman acted in self-defense. Counsel began by reminding the jury that Guzman was in Dickerson's apartment to settle a debt Dickerson owed to Guzman's friend, "JoJo." Trial Transcript, September 27, 2012, Exh. 59, p. 69 (ECF No. 24-26, p. 70). Counsel noted that Dickerson was high on methamphetamine at the time. *Id*. at 70 (ECF No. 24-26, p. 71). Counsel stressed Guzman "was jumped from behind" and "put in a chokehold." *Id*. at 71 (ECF No. 24-26, p. 72). Counsel argued that when Clewis saw Dickerson and Guzman "scuffling on the

ground," she "gets a crowbar and she starts whacking [Guzman] in the head." *Id.*

Counsel asked the jurors "how many of those whacks with the crowbar is sufficient for

my client to finally pull out the gun and start defending himself …?" *Id.* Counsel argued:

"[T]here's really nothing … to dispute my client's story that he walked into the room and

got immediately attacked by Mr. Dickerson." *Id.* at 77 (ECF No. 24-26, p. 78). Only after

making that argument, that Guzman acted in self-defense, did counsel go on to discuss

the prosecution's murder theories. He then argued:

> Now the State wants you to call it first degree murder and they have talked about what is required to call it first degree murder. It has to be premeditated. And, of course, that instruction says that premeditation doesn't take any time at all. It can occur as quickly as a successive thought of the mind. And, yet, it still must be present; premeditation, deliberation, willfulness.
>
> Now I would submit to you ladies and gentlemen, despite the State's recitation of the facts there is no evidence to suggest that any of those three requirements were present. But, even if there was they must all three be present. If you are to convict my [client] guilty of first degree murder, you must find that all three were present and those are in your jury instructions.
>
> Second degree murder quite simply is murder that is not first degree murder. And you could certainly find my client guilty of second degree murder, doesn't require that you find that it was premeditated. Doesn't require that you find it was deliberate or willful. It only requires that my client acted with a malignant heart. I could certainly understand that.
>
> You've also been given an instruction on voluntary manslaughter. …. And what that says is that voluntary manslaughter is the voluntary killing upon a sudden heat of passion, caused by provocation apparently sufficient to make the passion irresistible.
>
> The provocation required for voluntary manslaughter must either consist of a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. The serious and highly provoking injury which causes the sudden heat of passion can occur without direct physical contact. However neither slight provocation nor an assault of a trivial nature will reduce a homicide from murder to manslaughter….
>
> Was the attack of my client of a trivial nature? Was the attack of my client a slight provocation? Again, my client's in a dark room, he's surrounded by strangers; he's attacked from behind. He's being choked. He's having trouble breathing and then he's hit on the back of the head with a crowbar. I will leave it to you ladies and gentlemen to decide whether or not that was a trivial matter.

1
2
3

And, lastly, ladies and gentlemen, my client has instructions for you to consider on self-defense. The important thing about self-defense ladies and gentlemen is that once my client makes the allegation, the State has the burden of proof to demonstrate to you that it is not self-defense and they must show that beyond a reasonable doubt.

4
5
6
7
8

Jury Instruction 28, actual danger is not necessary to justify a killing in self-defense. A person has a right to defend from apparent danger to the same extent as he would from actual danger. The person killing is justified if: he is confronted by the appearance of imminent danger, which arouses in his mind an honest belief and fear that he is about to be killed or suffer great bodily injury. And he acts solely upon these appearances and his fear and actual beliefs. And a reasonable person in a similar situation would believe himself to be in like danger. The killing is justified even if it develops afterward that the person killing was mistaken about the extent of the danger. And that, ladies and gentlemen, is this case….

9
*Id*. at 77–79 (ECF No. 24-26, pp. 78–80).

10
Reading counsel's closing argument in its entirety, it is plain that he did not

11
abandon, or concede, the self-defense issue. Counsel's argument can reasonably be

12
understood as reasonably advocating a finding of self-defense, but, in the alternative, if

13
the jury were to find that did not apply, urging the jury to find voluntary manslaughter or

14
second-degree murder rather than first-degree murder. Affording deference to the state

15
court as required by 28 U.S.C. § 2254(d)—and deference to counsel as required by

16
*Strickland*—this Court determines that the Nevada Supreme Court reasonably ruled that

17
Guzman's trial counsel's closing argument was not deficient within the meaning of

18
*Strickland*. The Court will deny Guzman habeas corpus relief on Ground 5.

19
**2.    Grounds 2A, 2B, 3 and 4 - Sufficiency of the Evidence**

20
**a.    Ground 2A – Dickerson Homicide**

21
In Ground 2A, Guzman claims that there was insufficient evidence presented at

22
trial to convict him of second-degree murder for killing Anthony Dickerson. Third

23
Amended Petition (ECF No. 55), pp. 12–14.

24
In the ruling on Respondents' motion to dismiss, the Court determined that this

25
claim is not procedurally defaulted because Guzman asserted it on his direct appeal,

26
and the Nevada Supreme Court ruled on its merits. *See* Order entered February 24,

27
2022 (ECF No. 74), p. 8; *see also* Appellant's Opening Brief, Exh. 16, pp. 18–19 (ECF

28

1   No. 14-16, pp. 24–25); Order of Affirmance, Exh. 19, p. 2 (ECF No. 15-3, p. 3).

2   Therefore, the Court applies the AEDPA standard of review to this claim.

3        The Nevada Supreme Court ruled on this claim, on its merits, as follows:

> Guzman contends that there was insufficient evidence to support his second-degree murder conviction. We review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted); *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). Here, the jury heard testimony that Guzman, Charles Deverna, Nathan Gray, and Anthony Dickerson went to Dickerson's apartment to retrieve a printer. Once inside the apartment, Dickerson attacked Guzman and the two began fighting over a handgun. Deverna broke up the fight and was able to separate Dickerson from Guzman. However, Guzman still held the handgun and everyone else stood with their hands in the air and their palms facing outward. As Dickerson backed towards a wall with his hands up, Guzman shot him. Dickerson was shot twice, once in the chest and once in the back. We conclude that a rational juror could reasonably infer from this evidence that Guzman committed second-degree murder and was not acting in self-defense when he shot and killed Dickerson. *See* NRS 200.010(1); NRS 200.020; NRS 200.030(2); *People v. Hardin*, 102 Cal. Rptr. 2d 262, 268 n.7 (Ct. App. 2000) (the right to use force in self-defense ends when the danger ceases). It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports its verdict. *See Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

Order of Affirmance, Exh. 19, p. 2 (ECF No. 15-3, p. 3).

        The Nevada Supreme Court accurately stated the *Jackson* standard that applies to claims of insufficiency of evidence, and this Court determines that the Nevada Supreme Court reasonably applied that standard and denied the claim in Ground 2A.

        The trial court instructed the jury regarding second-degree murder, as follows:

> All murder which is not Murder of the First Degree is Murder of the Second Degree. Murder of the Second Degree is Murder with malice aforethought, but without the admixture of premeditation and deliberation[.]
>
>        *   *   *
>
> You are instructed that if you find that the State has established that the defendant has committed first degree murder you shall select first degree murder as your verdict. The crime of first degree murder includes the crime of second degree murder. You may find the defendant guilty of second degree murder if:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

         1. You have not found, beyond a reasonable doubt, that the defendant is guilty of murder of the first degree, and

         2. All twelve of you are convinced beyond a reasonable doubt the defendant is guilty of the crime of second degree murder.

         If you are convinced beyond a reasonable doubt that the crime of murder has been committed by the defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict of murder of the second degree.

Jury Instructions, Exh. 61, Instruction Nos. 18, 19 (ECF No. 24-28, pp. 19–20). The court instructed the jury regarding the meaning of "malice aforethought," as follows:

         Malice aforethought means the intentional doing of a wrongful act without legal cause or excuse or what the law considers adequate provocation. The condition of mind described as malice aforethought may arise, from anger, hatred, revenge, or from particular ill will, spite or grudge toward the person killed. It may also arise from any unjustifiable or unlawful motive or purpose to injure another, proceeding from a heart fatally bent on mischief or with reckless disregard of consequences and social duty. Malice aforethought does not imply deliberation or the lapse of any considerable time between the malicious intention to injure another and the actual execution of the intent but denotes an unlawful purpose and design as opposed to accident and mischance.

*   *   *

         Express malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof. Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

*Id.*, Instruction Nos. 13, 14 (ECF No. 24-28, pp. 14–15). And, the court instructed the jury as follows regarding voluntary manslaughter:

         Manslaughter is the unlawful killing of a human being without malice express or implied and without any mixture of deliberation.

         Voluntary Manslaughter is a voluntary killing upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible.

         The provocation required for Voluntary Manslaughter must either consist of a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. The serious and highly provoking injury which causes the sudden heat of passion can occur without direct physical contact. However, neither slight provocation nor an assault of a trivial nature will reduce a homicide from murder to manslaughter.

For the sudden, violent impulse of passion to be irresistible resulting in a killing, which is Voluntary Manslaughter, there must not have been an interval between the assault or provocation and the killing sufficient for the voice of reason and humanity to be heard; for, if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, then the killing shall be determined by you to be murder. The law assigns no fixed period of time for such an interval but leaves its determination to the jury under the facts and circumstances of the case.

\* \* \*

The heat of passion which will reduce a homicide to Voluntary Manslaughter must be such an irresistible passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the irresistible passion of the ordinarily reasonable man if likewise situated. The basic inquiry is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection and from such passion rather than from judgment.

\* \* \*

If you find the State has established that the defendant has committed murder you shall select the appropriate degree of murder as your verdict. The crime of murder may include the crime of voluntary manslaughter. You may find the defendant guilty of voluntary manslaughter if:

1. You have not found, beyond a reasonable doubt, that the defendant is guilty of murder of either the first or second degree, and

2. All twelve of you are convinced beyond a reasonable doubt the defendant is guilty of the crime of voluntary manslaughter.

If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or voluntary manslaughter, you must give the defendant the benefit of that doubt and return a verdict [of] voluntary manslaughter,

*Id.*, Instruction Nos. 23, 24, 25 (ECF No. 24-28, pp. 24–26).

The evidence at trial was sufficient for the jury to infer that Guzman committed second-degree murder when he shot and killed Dickerson. As the Nevada Supreme Court stated:

Once inside the apartment, Dickerson attacked Guzman and the two began fighting over a handgun. Deverna broke up the fight and was able to separate Dickerson from Guzman. However, Guzman still held the handgun and everyone else stood with their hands in the air and their palms facing outward. As Dickerson backed towards a wall with his hands up, Guzman shot him. Dickerson was shot twice, once in the chest and once in the back.

Order of Affirmance, Exh. 19, p. 2 (ECF No. 15-3, p. 3). There was evidence presented at trial—most importantly the testimony of Charles Deverna, an eyewitness—supporting a finding of those facts. Deverna's testimony included the following:

Q.    Okay. And what did you do when you guys all got into the room?

A.    I started—she [Clewis] had all the furniture moved against— into the kitchen, and the table and chairs and stuff, so I started moving them back and put them where they go. And then my son yells at me, Hey, dad, look. And when I turned around Tony [Dickerson] was wrestling with him [Guzman] down to the ground.

Q.    Tony was wrestling with who?

A.    With Smokey [Guzman].

Q.    Okay. So you said Nathan [Deverna's adolescent son] called out for you to look and you looked and that's what you saw?

A.    Yes.

Q.    When you first looked at what Smokey and Tony were doing, what did you see?

A.    I seen them wrestling around for the gun.

Q.    So the gun was out?

A.    Yeah, the gun was out.

Q.    Who had the gun?

A.    Smokey had the gun.

*    *    *

Q.    Okay. What did you do?

A.    I opened the front door, told my son to get out.

Q.    And did Nathan in fact run out?

A.    Yeah, he ran out.

16

Q.    What happened after Nathan left?

A.    I was trying to break them up. Break up—so there wasn't gonna be no problems or nothing. I was trying to get them to split up. And once I got them—well, when they were wrestling around, I'm trying to get them split up, Tammy [Clewis] was standing over back of us and she—she just freaking out, hitting every—well, hitting all three of us with the crowbar, you know.

\*   \*   \*

Q.    And what did you do as a result of Tammy doing that with the crowbar?

A.    I took the crowbar from her and told her to stop.

Q.    And did she in fact stop?

A.    Yeah.

Q.    What did Tammy do?

A.    She just stopped and—she-just stopped and try to let me break it up.

Q.    So did Tammy just stand there watching?

A.    Yeah.

Q.    What did you do with the crowbar?

A.    I threw it towards the corner.

Q.    After you got Tammy away from the scene and got the crowbar thrown over to the comer were you able to break those two up?

A.    Yes, after a minute; yeah.

Q.    So it took a minute?

A.    Yeah.

Q.    What happened after you got them separated?

A.    Well once you separated—the gun came back out and we all put our hands up.

Q.    Okay. Wait. Who took the gun out? Who made the gun come back out?

A.    All right. Smokey still had a gun. It never—the gun stayed in his hand the whole time.

Q.    Okay. So when you broke them up Smokey had the gun in his hand still?

1

    A.  Yes.

2

    Q.  Okay. And what happened when—you were just describing
something that Smokey did with the gun?

3

    A.  Yeah.

4

    Q.   What was that?

5

    A.  Well once they split up everybody stand—stood up and he

6

backed up towards the bed with the gun out, and Tony's backing up
towards—towards the wall with his hands up in the air, and I was backing

7

up towards the other side of the room with my hands up like this and that's
when he got shot.

8

    Q.  Meaning Smokey?

9

    A.  Yeah. Smokey shot him; yeah.

10

              *  *  *

11

    Q.  And you did a motion just now when you were saying what
Tony was doing. Was what—can you describe what that motion was?

12

    A.  We had our hands in the air.

13

    Q.  So you all had your hands in the air with the palms faced

14

out?

15

    A.  Yes.

16

    Q.  Did Tony have anything in his hands?

17

    A.  No, he didn't.

18

    Q.  Was he able to get back to the wall as he's backing up?

19

    A.  He got maybe a couple—to like maybe two, three feet from

20

it.

21

Trial Transcript, September 25, 2012, Exh. 56, pp. 177–82 (ECF No. 24-23, pp. 178–

22

83). Dr. Alaine Olson, the medical examiner who performed the autopsy of Dickerson,

23

testified that he was shot twice, once in the chest and once in the back. Trial Transcript,

24

September 26, 2012, Exh. 58, pp. 82–90 (ECF No. 24-25, pp. 83–91).

25

    The Supreme Court concluded from such evidence "that a rational juror could

26

reasonably infer from this evidence that Guzman committed second-degree murder and

27

was not acting in self-defense when he shot and killed Dickerson." Order of Affirmance,

28

Exh. 19, p. 2 (ECF No. 15-3, p. 3). That ruling was not contrary to, or an unreasonable

application of, *Jackson* or any other Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented. The Court will deny Guzman habeas corpus relief with respect to Ground 2A.

### b.      Grounds 2B, 3 and 4 – Clewis Homicide

In Ground 2B, Guzman claims that his federal constitutional rights were violated because there was insufficient evidence presented at trial to convict him of first-degree murder for killing Clewis. Third Amended Petition (ECF No. 55), p. 15. In Ground 3, Guzman claims that his federal constitutional rights were violated on account of ineffective assistance of counsel because his appellate counsel "fail[ed] to argue the State presented insufficient evidence to convict Mr. Guzman of first degree murder regarding Tammy." *Id*. at 15–16. And in Ground 4, Guzman claims that his federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel failed to seek an advisory verdict, a directed verdict, or judgment notwithstanding the verdict. *Id*. at 17.

In the ruling on Respondents' motion to dismiss, the Court determined that each of these three claims is subject to application of the procedural default doctrine. *See* Order entered February 24, 2022 (ECF No. 74), pp. 8–11. The question, therefore, is whether Guzman can overcome the procedural default of these claims.

Guzman argues that he can show cause and prejudice, to overcome the procedural default of Ground 2B by showing that his appellate counsel and his trial counsel were ineffective in handling the question whether there was sufficient evidence presented to support the first-degree murder conviction. Guzman argues that his appellate counsel should have raised, on his direct appeal, the issue of the sufficiency of the evidence to support his first-degree murder conviction. Guzman argues his trial counsel should have sought an advisory verdict, a directed verdict, or judgment notwithstanding the verdict. Those arguments mirror Grounds 3 and 4. So, in order to show cause and prejudice to overcome the procedural default of Ground 2B, Guzman must overcome the procedural default of either or both of Grounds 3 and 4. *See*

*Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000). Guzman claims he can overcome the procedural default of Ground 4, the claim of ineffective assistance of trial counsel, under *Martinez*, because of ineffective assistance of his first state post-conviction counsel. Guzman claims he can likewise overcome the procedural default of Ground 3, the claim of ineffective assistance of appellate counsel, because of ineffective assistance of his first state post-conviction counsel; while the Supreme Court held in *Davila v. Davis*, 582 U.S. 521, 525 (2017), that *Martinez* does not apply to claims of ineffective assistance of appellate counsel, Guzman argues that *Davila* was wrongly decided, or alternatively, that *Davila* should not apply because Guzman's post-conviction counsel effectively abandoned him with respect to claims of ineffective assistance of counsel because of an alleged conflict of interest.

All of Guzman's arguments that he can show cause and prejudice to overcome the procedural defaults of Grounds 2B, 3 and 4 ultimately raise the question of the validity of his claim that there was insufficient evidence to support his first-degree murder conviction (and, regarding Ground 4, the validity of his argument as to his second-degree murder conviction as well). In order to meet the requirements of *Martinez*, and to establish the prejudice component of the cause and prejudice analysis, Guzman must make a showing that his claim of insufficiency of the evidence is at least a substantial claim.

In addition to the instructions regarding murder and manslaughter quoted above, the trial court gave the jury the following instructions concerning first-degree murder:

> Murder of the first degree is murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing. All three elements—willfulness, deliberation, and premeditation—must be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder.

> Willfulness is the intent to kill. There need be no appreciable space of time between formation of the intent to kill and the act of killing.

> Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the actions.

A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.

Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.

Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.

\*   \*   \*

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

\*   \*   \*

The intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of its use, and the attendant circumstances characterizing the act.

Jury Instructions, Exh. 61, Instruction Nos. 15, 16, 17 (ECF No. 24-28, pp. 16–18).

The Court determines that it is beyond any real dispute that a reasonable juror could have found that Guzman's killing of Clewis was willful, deliberate and premeditated, and was murder in the first degree. There was evidence that Guzman took a loaded gun with him to collect on a debt for his friend, JoJo, and that, well before he was attacked by Dickerson, Guzman handled the gun in a threatening manner. Trial Transcript, September 25, 2012, Exh. 56, pp. 172, 175–76, 197–202 (ECF No. 24-23, pp. 173, 176–77, 198–203) (testimony of Deverna). Then, Deverna testified, at Dickerson and Clewis's apartment, after Deverna broke up the fight, the situation was somewhat calm. *Id*. at 204 (ECF No. 24-23, p. 205). Deverna testified that Guzman,

however, was holding the gun, waiving it at Deverna, Dickerson and Clewis, and

Deverna, Dickerson and Clewis were backing away from Guzman with their hands in

the air, palms facing out, as if to surrender. *Id*. at 180–83, 206–07 (ECF No. 24-23,

pp.181–84, 207–08). Then, after Guzman shot Dickerson there was a distinct pause

before he shot Clewis. *Id*. at 41–43, 51–52, 55 (ECF No. 24-23, pp. 42–44, 52–53)

(testimony of Richard Harrison, maintenance worker at apartments); *id*. at 98, 104, 105–

06, 107 (ECF No. 24-23, pp. 99, 105, 106–07, 108) (testimony of Bonnie Belt,

neighbor); *id*. at 110–11, 113 (ECF No. 24-23, pp. 111–12, 114) (testimony of Amy

Greene, neighbor); *id*. at 117 (ECF No. 24-23, p. 118) (testimony of Ronald Flannery,

neighbor); *id*. at 183–84, 214 (ECF No. 24-23, pp. 184–85, 215) (testimony of Deverna).

Deverna testified that after Guzman shot Dickerson, "I kind of get everybody to calm

down for a second," "[t]hen [Guzman] tells me, You're gonna drive me out of here." *Id*.

at 207 (ECF No. 24-23, p. 208). Then, after Guzman shot Dickerson, and after the

pause, Guzman placed the barrel of the gun to the back of Clewis's head and shot her

execution style. Trial Transcript, September 26, 2012, Exh. 58, pp. 91–95, 95–102,

106–09, 109–10 (ECF No. 24-25, pp. 92–96, 96–103, 107–10, 110–11) (testimony of

Dr. Alaine Olson, the medical examiner who performed the autopsy of Clewis, that the

gunshot wound on the back of Clewis's head was a contact gunshot wound). There is

then evidence that, after the shootings, Deverna was outside looking for his son and

Guzman came running up behind him, and then they got in the truck and left; Deverna

testified that he drove, and Guzman, in the passenger seat, held the gun in his lap and

said "don't do nothing stupid or nothing," and "I still have more bullets in here." Trial

Transcript, September 25, 2012, Exh. 56, pp. 184–86 (ECF No. 24-23, pp. 185–87). In

light of all this evidence, a reasonable juror could have found that there was time for the

passion Guzman felt as a result of being attacked by Dickerson and hit with a crowbar

by Clewis, to subside and deliberation to occur. A reasonable juror could have found

that Guzman's killing of Clewis, by shooting her, point blank, in the back of her head,

was not a mere unconsidered and rash impulse, and that he acted willfully, deliberately and with premeditation, and thereby committed first degree murder.

Guzman's claim that there was insufficient evidence to support his first-degree murder conviction is not a substantial claim. Guzman does not meet the requirements of *Martinez* with respect to Grounds 3 and 4 (as it relates to the Clewis murder) and he cannot show prejudice with respect to either of those claims. (Nor can he meet the *Martinez* standard with respect to his claim in Ground 3 regarding the Dickerson murder, for the reasons explained above with respect to Ground 2A, as that is not a substantial claim either.) So, the Court determines that Grounds 3 and 4 fail as procedurally defaulted. And it follows that, because Grounds 3 and 4 fail as procedurally defaulted, Guzman cannot show cause and prejudice with respect to Ground 2B. *See Edwards*, 529 U.S. at 450–51. The Court will deny Guzman's claims in Grounds 2B, 3 and 4 as procedurally defaulted.

### 3.    Grounds 6A, 6B and 6C – Expert Witnesses

#### a.    Ground 6A

In Ground 6A, Guzman claims that his federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel "should've called a physician to discuss Mr. Guzman's hand injury." Third Amended Petition (ECF No. 55), pp. 19–21.

In the ruling on Respondents' motion to dismiss, the Court determined that this claim is not procedurally defaulted because Guzman asserted it on the appeals in his first and second state habeas actions, and the Nevada Supreme Court ruled on its merits. *See* Order entered February 24, 2022 (ECF No. 74), pp. 11–12; *see also* Appellant's Opening Brief, Exh. 26, pp. 18–25 (ECF No. 15-10, pp. 24–31); Order of Affirmance, Exh. 29, p.3 (ECF No. 15-13, p. 4); Appellant's Opening Brief, Exh. 45, pp. 33–39 (ECF No. 48-9, pp. 46–52); Order of Affirmance, Exh. 53, p. 2 (ECF No. 48-17, p. 3). Therefore, the Court applies the AEDPA standard of review to this claim.

1    In denying this claim on the appeal in Guzman's first state habeas action, the

2    Nevada Supreme Court ruled:

3        … Guzman contends that counsel should have presented medical
         records or expert testimony establishing that his right hand was injured at
4        the time of the incident. Because the evidence presented at trial
         established that Guzman's hand was in a cast at the time of the incident
5        and further evidence regarding the extent of his injuries was unnecessary,
         particularly given that he admitted to shooting the victims, Guzman failed
6        to demonstrate deficient performance or prejudice.

7    Order of Affirmance, Exh. 29, p. 3 (ECF No. 15-13, p. 4). On Guzman's appeal in his

8    second state habeas action, the Nevada Supreme Court applied the law of the case

9    doctrine and commented that the new evidence Guzman offered in support of the claim

10   would have no effect on the outcome, and again denied relief on the claim. Order of

11   Affirmance, Exh. 53, p. 2 (ECF No. 48-17, p. 3). This Court determines that the Nevada

12   Supreme Court's ruling on this claim was reasonable.

13       The crux of the Nevada Supreme Court's ruling was that "the evidence presented

14   at trial established that Guzman's hand was in a cast at the time of the incident and

15   further evidence regarding the extent of his injuries was unnecessary…." Order of

16   Affirmance, Exh. 29, p. 3 (ECF No. 15-13, p. 4).

17       There is no question that there was ample evidence that Guzman's right hand

18   was in a cast when he killed Dickerson and Clewis. His own testimony was as follows:

19       Q.    All right. Now, there's been some testimony that at the time
         of the events that, you know, form the basis of this proceeding you had a
20       cast on your hand.

21       A.    Yes.

22       Q.    Did you have a cast on your hand?

23       A.    Yes.

24       Q.    Why did you have a cast on your hand?

25       A.    I had a boxer sprain.

26       Q.    I'm sorry?

27       A.    I had a boxer sprain.

28       Q.    Okay. Do you know how you received that injury?

1      A.      I was boxing.

2      Q.      Okay. What medical treatment did you receive as a result of
       that injury?
3

4      A.      I had a pin. I had a pin in my hand.

5      Q.      And how was that put in your hand?

6      A.      Oh, I had surgery. It was like this long [gesturing] of a pin.

7      Q.      Okay. And that cast was still on your hand on the date and
       time that these incidents occurred?

8      A.      Yes.

9      Q.      And was that on your left or right hand?

10     A.      My right hand.

11     Q.      Are you left or right-handed?

12     A.      Right-handed.

13     Q.      Can you show the jury where that cast was on your hand?

14     A.      Yes. It started from here [indicating]—

15     Q.      And you're indicating like your middle knuckle?

16     A.      My middle knuckle to my—to the back of my forearm
       [indicating].
17

18     Trial Transcript, September 27, 2012, Exh. 59, pp. 7–8 (ECF No. 24-26, pp. 8–9). After

19     eliciting that testimony from Guzman, Guzman's trial counsel argued its significance at

20     the very beginning of his closing argument:

21          … [L]et us talk first about my client's cast and the significance of
          that. My client testified that he had surgery on his arm. He had a
22        pin inserted in his arm. This is not refuted. Nobody came in here to testify
          that that wasn't true. My client had a cast on his arm; this is not refuted;
23        nobody came in here to testify that that wasn't true. In fact, even the
          detective acknowledged that the information he had was that my client
24        had a cast when this incident occurred.

25          So what is the significance of my client having a cast on his arm? Is
          the significance that, you know, our position is he couldn't draw a
26        rudimentary map? Is the significance of my client having a cast on his arm
          that he couldn't pick up a pencil and sketch this diagram the next day? No,
27        that is not the significance of the cast on my client's arm. The significance
          of the cast on my client's arm is that he could not hold a handgun in his
28

25

right hand. My client is right-handed. That is unrefuted. No one has come in to testify that that is not true.

Now, many of you on this jury I asked in jury selection if you had ever fired a handgun[.] And the reason I asked that … is because if you ever have fired a handgun, you know that it's not an easy thing to do. It takes training to fire a handgun accurately. It takes practice to fire a handgun accurately. If you are a police officer, you have to demonstrate a certain level of skill with a handgun before you can even carry one on the job. And it is nothing … you can do the very first time you pick one up.

My client testified and this is unrefuted, nobody came in and testified that it wasn't true, that he had never fired a handgun before. Now, it is doubly difficult or perhaps triply or perhaps tenfold to fire a handgun with [your] left hand if you're right-handed or your right hand if you're left-handed. If you have ever tried to do this in training, you know that it is extremely difficult.

Now, I understand the gun was never recovered in this case and I don't know what kind of weapon it was. Perhaps it was a finely oiled and maintained weapon with a perfect action that was smooth; it could have been, but it was never recovered so we can't say. Similarly, it could have been an old rusty gun, which it was described by one of the witnesses, I believe Nathan said it was, in which case it would have been very difficult to pull the trigger. But we never found the gun, so we can't say.

In any case, shooting with your left hand when you're right-handed is very, very difficult. It's very hard to be accurate. And, additionally, when you're in a situation like my client was, where he's in a dark room, where he's surrounded by strangers, two of whom are attacking him, all of whom are high on methamphetamine, it is much more difficult to fire that weapon accurately.

That is the significance ladies and gentlemen of my client having a cast. He could not hold a gun in his right hand. He had to fire it with his left hand. He had never fired a gun before. And, yet, the State wants you to believe that he was a great shot. That he hit what he aimed at which is simply, simply not true.

*Id*. at 65–67 (ECF No. 24-26, pp. 66–68).

Guzman's trial counsel testified about this matter, as follows, at the evidentiary in

Guzman's first state habeas action:

Q.     Okay. Have you been given an opportunity this morning to look over some medical records that I handed to you?

A.     Yes.

Q.     Okay. Did it appear to demonstrate to you that he, in fact, had a fractured hand?

A.     Yes.

26

Q.      Okay. And do you believe that that would have been helpful to you if you'd been able to show the jury that actually he had a fractured hand?

A.      You know, I don't really see that as being helpful. I mean my whole point was whatever the condition of his hand was he had a cast on. His hand was immobile, you know. Whether it, you know, whether it was broken; whether it was in the process of healing; whether it was healed and he was getting ready to take it off. I didn't see that as the issue. The issue to me was he had a cast on and he could not use his right hand. Certainly, could not use it to draw a weapon, no matter what the medical condition of his hand was.

*   *   *

Q.      Did you feel that the prosecution was essentially mocking the defense strategy that his hand was so injured that this would have really diminished his ability to defense himself?

A.      Well, I don't know that they were mocking the defense strategy but I think they were misunderstanding it. I mean the defense strategy was his hand was immobilized because he wore—he had a cast, you know. It doesn't matter what the condition of his hand is; you cannot fire a gun with—you cannot fire a handgun when your hand is in a cast, you can't.

*   *   *

Q.      Would you have seen any harm in contacting the doctor, let's say, and putting forth the doctor just to describe the limitations?

A.      Well, I mean, look, I didn't know what stage of healing his hand was in. I suppose the harm would have been if his cast was getting ready to come off. I don't know. I don't remember, you know, where he was in the healing process. And I suppose if the doctor came in and said, well, yeah, it was just about ready to come off that might not have been helpful.

*   *   *

Q.      You looked at it that, hey, he was in a cast; I've got his testimony, there we go, essentially?

A.      Well, I looked at it as he was in a cast and, therefore, he was you know, he was handicapped in this fight, by virtue of being in a cast.

*   *   *

Q.      So the extent of the injury would not have mattered to—in your strategy?

A.      No, the fact that he could not fire a gun with his right hand because of the cast was the important point in my mind.

Transcript of Evidentiary Hearing, December 1, 2015, Exh. 74, pp. 8–11, 32 (ECF No. 24-41, pp. 9–12, 33).

Guzman does not make any showing that it would have added to his defense to have presented evidence of the precise medical condition of his hand. The jury was informed that his dominant right hand was in a cast, that he was disadvantaged when attacked by Dickerson and Clewis, and that he had to operate the handgun with his left hand. As Guzman's counsel explained in his testimony at the evidentiary hearing, the exact medical condition of the hand in the cast was not an issue.

The Nevada Supreme Court reasonably ruled that Guzman's trial counsel did not perform inadequately in not presenting testimony of Guzman's treating physician, or any other expert witness, regarding the condition of his hand when he shot and killed Dickerson and Clewis, and that Guzman's defense was not prejudiced. The Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, *Strickland*, or any other Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny Guzman habeas corpus relief on the claim in Ground 6A.

### b.    Ground 6B

In Ground 6B, Guzman claims that his federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel "should've called a self-defense expert." Third Amended Petition (ECF No. 55), p. 22.

In the ruling on Respondents' motion to dismiss, the Court determined that this claim is not procedurally defaulted because Guzman asserted it on the appeals in his first and second state habeas actions, and the Nevada Supreme Court ruled on its merits. *See* Order entered February 24, 2022 (ECF No. 74), pp. 11–12; *see also* Appellant's Opening Brief, Exh. 26, pp. 18–25 (ECF No. 15-10, pp. 24–31); Order of Affirmance, Exh. 29, pp. 2–3 (ECF No. 15-13, pp. 3–4); Appellant's Opening Brief, Exh. 45, pp. 33–39 (ECF No. 48-9, pp. 46–52); Order of Affirmance, Exh. 53, p. 2 (ECF

1   No. 48-17, p. 3). Therefore, the Court applies the AEDPA standard of review to this

2   claim.

3           On the appeal in Guzman's first state habeas action, the Nevada Supreme Court

4   denied relief on this claim, ruling as follows:

5               … Guzman contends that counsel should have presented
6           testimony from a "self-defense expert." At the evidentiary hearing,
            counsel explained that he did not believe such an expert was necessary
            because the circumstances spoke for themselves and an expert would
7           have undoubtedly been confronted with the unhelpful facts that Guzman
            went to the victims' apartment to enforce a debt, brought a firearm, and
8           shot one of the victims in the back of the head at close range. Guzman
            failed to demonstrate that a reasonable attorney would have pursued this
9           matter further. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to
            make reasonable investigations or to make a reasonable decision that
10          makes particular investigations unnecessary."). Moreover, Guzman did not
            identify an expert in his petition or at the evidentiary hearing or provide
11          specific examples of what testimony an expert would have provided.
            [Footnote: Although Guzman stated below that the district court had not
12          authorized funding for him to contact experts, he does not raise this matter
            on appeal.] He therefore failed to demonstrate a reasonable probability
13          that the result of trial would have been different but for counsel's error.
            Accordingly, we conclude that the district court did not err by denying this
14          claim.

15  Order of Affirmance, Exh. 29, pp. 2–3 (ECF No. 15-13, pp. 3–4). On Guzman's appeal

16  in his second state habeas action, the Nevada Supreme Court applied the law of the

17  case doctrine and again denied relief on the claim. Order of Affirmance, Exh. 53, p. 2

18  (ECF No. 48-17, p. 3).

19          The Nevada Supreme Court's ruling was reasonable, and it was supported by

20  the testimony of Guzman's trial counsel at the evidentiary hearing. *See* Transcript of

21  Evidentiary Hearing, December 1, 2015, Exh. 74, pp. 14–21, 32 (ECF No. 24-41, pp.

22  15–22).

23          Furthermore, Guzman did not in his state habeas actions—and he has not in this

24  case—identified any "self-defense expert" his counsel could have called to testify and

25  he has not shown what testimony any such expert would have provided. With respect to

26  this, in his reply, Guzman states:

27          Mr. Guzman acknowledges he hasn't presented a specific potential
            expert, and he recognizes that under current law that omission will likely
28

impact the Court's prejudice analysis regarding this claim. *See, e.g.*, *Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019).

Reply (ECF No. 92), p. 50. This Court agrees that this affects the prejudice analysis. It also affects the performance analysis.

Guzman does not show that the Nevada Supreme Court was unreasonable in ruling that his trial counsel did not perform inadequately in not presenting a "self-defense expert" and that he was not prejudiced. The Court will deny Guzman habeas corpus relief on his claim in Ground 6B.

### c.    Ground 6C

In Ground 6C, Guzman claims that his federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel "should've called an expert regarding meth." Third Amended Petition (ECF No. 55), pp. 22–23.

In the ruling on Respondents' motion to dismiss, the Court determined that this claim is not procedurally defaulted because Guzman asserted it on the appeals in his first and second state habeas actions, and the Nevada Supreme Court ruled on its merits. *See* Order entered February 24, 2022 (ECF No. 74), pp. 11–12; *see also* Appellant's Opening Brief, Exh. 26, pp. 18–25 (ECF No. 15-10, pp. 24–31); Order of Affirmance, Exh. 29, p. 3 (ECF No. 15-13, p. 4); Appellant's Opening Brief, Exh. 45, pp. 33–39 (ECF No. 48-9, pp. 46–52); Order of Affirmance, Exh. 53, p. 2 (ECF No. 48-17, p. 3). Therefore, the Court applies the AEDPA standard of review to this claim.

On the appeal in Guzman's first state habeas action, the Nevada Supreme Court denied relief on this claim, ruling as follows:

> … Guzman contends that counsel should have presented expert testimony from a toxicologist, who could have explained that the victims' methamphetamine use would have made them aggressive and paranoid. Counsel explained that he made a strategic decision to elicit this testimony from one of the State's witnesses. This decision was reasonable. Guzman also failed to demonstrate a reasonable probability of a different result had this evidence been presented. Therefore, we conclude that the district court did not err by denying this claim.

Order of Affirmance, Exh. 29, p. 3 (ECF No. 15-13, p. 4). On Guzman's appeal in his second state habeas action, the Nevada Supreme Court applied the law of the case

1  doctrine and again denied relief on the claim. Order of Affirmance, Exh. 53, p. 2 (ECF

2  No. 48-17, p. 3).

3       The Nevada Supreme Court's ruling was reasonable, and it was supported by

4  the testimony of Guzman's trial counsel at the evidentiary hearing. *See* Transcript of

5  Evidentiary Hearing, December 1, 2015, Exh. 74, pp. 12–14, 32 (ECF No. 24-41, pp.

6  13–15).

7       Furthermore, here again, Guzman did not in his state habeas actions—and he

8  has not in this case—identified any expert witness his counsel could have called to

9  testify and he has not shown what testimony any such expert would have provided. And

10  again, Guzman states:

11       Mr. Guzman acknowledges he hasn't presented a specific potential
         expert, and he recognizes that under current law that omission will likely
12       impact the Court's prejudice analysis regarding this claim. *See, e.g., Djerf*,
         931 F.3d at 881.
13

14  Reply (ECF No. 92), p. 51.

15       Guzman does not show that the Nevada Supreme Court was unreasonable in

16  ruling that his trial counsel did not perform inadequately in not presenting expert

17  testimony on the effects of methamphetamine and that he was not prejudiced. The

18  Court will deny Guzman habeas corpus relief on his claim in Ground 6C.

19                    **4.    Grounds 7 and 8 – Jury Instruction No. 26**

20       In Ground 7, Guzman claims that his federal constitutional rights were violated on

21  account of ineffective assistance of counsel because his trial counsel failed to challenge

22  Jury Instruction 26. Third Amended Petition (ECF No. 55), pp. 23–25. In Ground 8,

23  Guzman claims that his federal constitutional rights were violated because "[j]ury

24  instruction 26 was fundamentally unfair." *Id.* at 25.

25       In the ruling on Respondents' motion to dismiss, the Court determined that the

26  claims in Grounds 7 and 8 are subject to application of the procedural default doctrine.

27  *See* Order entered February 24, 2022 (ECF No. 74), pp 12–13. The question, therefore,

28  is whether Guzman can overcome the procedural default of these claims.

1    Guzman argues that he can overcome the procedural default of the ineffective

2    assistance of trial counsel claim in Ground 7 under *Martinez*, and he argues that he can

3    overcome the procedural default of the substantive claim in Ground 8 by showing

4    ineffective assistance of his trial counsel with respect to the issue, as alleged in Ground

5    7. As a practical matter, both arguments turn on the validity of the substantive claim. To

6    satisfy *Martinez*, with respect to Ground 7, Guzman must show that the claim of

7    ineffective assistance of trial counsel is substantial, which essentially means showing

8    that there was a valid issue to be raised regarding the jury instruction. And, with respect

9    to the substantive claim in Ground 8, to overcome the procedural default, Guzman must

10    show that he was prejudiced by his trial counsel's failure to raise the issue, or in other

11    words, that there was some merit to the claim.

12    Jury Instruction 26 addressed the matter of self-defense. Guzman takes issue

13    with the part of Instruction 26 that stated: "An honest but unreasonable belief in the

14    necessity for self-defense does not negate malice and does not reduce the offense from

15    murder to manslaughter." *See* Third Amended Petition (ECF No. 55), pp. 23–25; *see*

16    *also* Jury Instruction 26, Exh. 61 (ECF No. 24-28, p. 27).

17    Notably, in 2000, the Nevada Supreme Court expressly approved of, and

18    suggested use of, exactly the language in Jury Instruction 26. *See Runion v. State*, 116

19    Nev. 1041, 1051, 13 P.2d 52, 59 (2000). Of course, that case involved different facts,

20    and the sample instruction was provided by the Nevada Supreme Court only for

21    consideration by the district courts, but that is at least a strong indication that the

22    instruction is a correct statement of Nevada law, and, importantly, that any challenge to

23    the instruction at trial would have been futile.

24    Moreover, in the context of the facts of Guzman's case, the language of

25    Instruction 26 that he complains about was not inaccurate or confusing. Again, that

26    language was: "An honest but unreasonable belief in the necessity for self-defense

27    does not negate malice and does not reduce the offense from murder to manslaughter."

28    Guzman argues:

> This is a confusing instruction because it incorrectly suggests that if a defendant unsuccessfully argues self-defense, then the defendant is ineligible for a voluntary manslaughter conviction and must be found guilty of some form of murder.

Third Amended Petition (ECF No. 55), p. 24. However, the statement of law in Instruction 26 that Guzman complains of simply—and accurately—identifies a factual scenario that *would not* reduce the offense from murder to manslaughter; it does not conflict with or undermine the other jury instructions that accurately informed the jury of circumstances that *would* reduce the offense from murder to manslaughter. *See* Jury Instructions 12, 13, 14, 18, 19, 23, 24, 25, Exh. 61 (ECF No. 24-28, pp. 13, 14, 15, 19, 20, 24, 25, 26). Put differently, read within the context of all the instructions provided to the jury, Instruction 26 was not misleading.

This Court finds that Guzman's challenge to Jury Instruction 26 is wholly without merit. Guzman's trial counsel did not perform unreasonably in not raising this issue, and Guzman was not prejudiced. With regard to the claim in Ground 7, Guzman does not show that his claim of ineffective assistance of trial counsel is substantial, within the meaning of *Martinez*.

The Court will deny habeas corpus relief on Grounds 7 and 8 as procedurally defaulted.

### 5.  Ground 9 – Settlement Offer

In Ground 9, Guzman claims that his federal constitutional rights were violated because "[t]rial counsel failed to communicate a favorable plea offer to Mr. Guzman." Third Amended Petition (ECF No. 55), p. 26.

In the ruling on Respondents' motion to dismiss, the Court determined that this claim is subject to application of the procedural default doctrine. *See* Order entered February 24, 2022 (ECF No. 74), p 14. That is because Guzman failed to raise this claim in his first state habeas action (*see* Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 21 (ECF No. 15-5); Appellant's Opening Brief, Exh. 26 (ECF No. 15-10); Appellant's Reply Brief, Exh. 28 (ECF No. 15-12)), and when he raised it in his

second state habeas action, the Nevada Supreme Court ruled the claim procedurally

barred (*see* Order of Affirmance, Exh. 53, p. 3 (ECF No. 48-17, p. 4)). The Nevada

Supreme Court's ruling that this claim (along with the claims in Grounds 10 and 11) was

procedurally barred was as follows:

> Guzman also contends that he established prejudice with
> respect to his claims that his trial counsel failed to communicate a plea
> offer to him (Ground 9), that the State committed a *Brady* violation by
> failing to turn over evidence that it gave favorable treatment to a witness
> (Ground 10), and that Guzman's trial counsel was ineffective for failing to
> investigate whether favorable treatment was given. We review these
> issues de novo. *State v. Huebler*, 128 Nev. 192, 197–98, 275 P.3d 91, 95–
> 96 (2012).

> Irrespective of whether Guzman established prejudice, we
> agree with the district court that Guzman failed to establish good cause to
> bring those claims in the underlying petition. *See Hathaway v. State*, 119
> Nev. 248, 253, 71 P.3d 503, 506 (2003) ("[A] claim or allegation that was
> reasonably available to the petitioner during the statutory time period
> would not constitute good cause to excuse the delay."). Accordingly, the
> district court correctly determined that Grounds 9, 10 and 11 in Guzman's
> second petition were procedurally barred and that an evidentiary hearing
> was unwarranted.

Order of Affirmance, Exh. 53, pp. 2–3 (ECF No. 48-17, pp. 3–4).

Guzman contends that he can overcome the procedural default of the claim in

Ground 9, under *Martinez*, by showing that his counsel in his first state habeas action

was ineffective for failing to assert the claim. To do this, though, Guzman has to show

that his claim that trial counsel failed to convey to him a settlement offer is at least a

substantial claim, and he fails to do so.

Guzman's claim in Ground 9, in its entirety, is as follows:

> *On information and belief*, the State presented Mr. Guzman with a
> plea offer. While the prosecution represented at an August 22, 2011,
> hearing that it hadn't made a "specific offer" at that point (ECF No. 24-12
> ([Exh.] 45)), *on information and belief*, the State did extend a specific offer
> after that point (or it had previously extended general offers). *See* ECF No.
> 42-2 [Exh. 36] ¶ 3. *On information and belief*, the plea offer would've been
> more favorable to Mr. Guzman than the convictions he received after trial.
> *On information and belief*, counsel never communicated any plea offers to
> Mr. Guzman. *On information and belief*, had counsel communicated a plea
> offer to Mr. Guzman, he would've agreed to it, and the state court
> would've accepted it. Mr. Guzman's Sixth Amendment rights were
> therefore violated. *See Lafler v. Cooper*, 566 U.S. 156 (2012).

1   Third Amended Petition (ECF No. 55), p. 26 (emphasis added).

2          Under well-established Supreme Court precedent, the Sixth Amendment right to

3   effective assistance of counsel extends to the plea-bargaining process. *See Lafler v.*

4   *Cooper*, 566 U.S. 156, 162–63 (2012); *Missouri v. Frye*, 566 U.S. 134, 144–45 (2012).

5   Defense counsel generally "has the duty to communicate *formal* offers from the

6   prosecution to accept a plea on terms and conditions that may be favorable to the

7   accused." *Frye*, 566 U.S. at 145 (emphasis added).

8          At a pre-trial conference on August 22, 2012, 33 days before Guzman's trial

9   commenced, the following exchange occurred:

10             THE COURT:  ….Any offers outstanding that we need to
       communicate? Or frankly, the way I like to handle this as a consequence
11     of the new U.S. Supreme Court direction is—is that there's conversations
       and that offers have been conveyed, I don't need to get into the specifics
12     of them, because that's between you. I just want to make sure the record
       is clear that people are talking and that they've been communicated to the
13     client.

14             MR. PESCI [prosecutor]:  Nothing's been communicated because
       there has been no specific offer relayed.
15
               THE COURT:  Okay, And that's your prerogative. You don't have to
16     offer anything. I just want to know—that it's stated here in open court—

17             MR. SCHWARZ [defense counsel]:  That's true, Judge.

18             THE COURT:  —where that is. All right. Fair enough….

19   Transcript of Pre-Trial Conference, August 22, 2012, Exh. 45, pp. 2–3 (ECF No. 24-12,

20   pp. 3–4). Nonetheless, Guzman contends—on "information and belief"—that the

21   prosecution extended a plea offer and his trial counsel did not inform him of it.

22          The only evidence Guzman proffers, in his attempt to show that the prosecution

23   extended a plea offer, that his counsel failed to convey the offer to him, that the offer

24   was more favorable than the results of his trial, and that he would have accepted the

25   offer had his counsel conveyed it to him, is a declaration of his trial counsel, signed on

26   February 25, 2019, more than six years after his trial and more than a year after the

27   conclusion of his first state habeas action. *See* Declaration of Michael Schwarz, Exh. 36

28   (ECF No. 42-2). In that declaration, counsel states only:

> I recall the State offered Mr. Guzman a plea deal before trial, but I do not recall the specifics of the deal.

*Id*. at ¶ 3. That brief, cryptic statement does not show that the prosecution extended a *formal* plea offer, that trial counsel failed to convey the offer to Guzman, that the offer was more favorable than the results of Guzman's trial, and that Guzman would have accepted the offer had counsel conveyed it to him. Even considering this declaration of trial counsel, Guzman's claim is insubstantial.

But furthermore, under *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), this Court cannot consider the declaration. The *Ramirez* Court held that in applying *Martinez*, "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel" unless the petitioner satisfies the requirements of 28 U.S.C. § 2254(e)(2). *Ramirez*, 142 S. Ct. at 1734.

The *Ramirez* Court acknowledged that § 2254(e)(2) applies only when there has been "a failure to develop the factual basis of a claim," something that "is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id*. at 1735. The *Ramirez* Court explained that a prisoner bears the risk for all attorney errors unless counsel provides constitutionally ineffective assistance, and since there is no constitutional right to counsel in state post-conviction proceedings, "a prisoner ordinarily must 'bea[r] responsibility' for all attorney errors during those proceedings." *Id*. (quoting *Williams v. Taylor*, 529 U.S. 420, 432 (2000)). "Among those errors," the Court explained, "a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record." *Id*.

So, the Supreme Court held, in such a case, where the petitioner failed to develop the factual basis of a claim in state court, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy the requirements of § 2254(e)(2). *Id*. Under § 2254(e)(2), if the petitioner has "failed to develop the factual basis of a claim in State court proceedings," a district court

cannot hold an evidentiary hearing on the claim unless (1) the claim relies on either a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review or a factual predicate that could not have been previously discovered through due diligence and (2) the facts underlying the claim would establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty. 28 U.S.C. § 2254(e)(2).

Guzman did not assert the claim in Ground 9 in his first state habeas action, and, therefore, did not present the declaration of his trial counsel in that case—in fact, Guzman's trial counsel did not sign the declaration until more than a year after Guzman's first state habeas action was concluded. It was because Guzman failed to raise this claim in his first state habeas action that his second state habeas action was ruled procedurally barred. *See* Order of Affirmance, Exh. 53, pp. 2–3 (ECF No. 48-17, pp. 3–4). So, § 2254(e)(2) applies.

Guzman points out that he did present his counsel's declaration in his second state habeas action. *See* Reply (ECF No. 92), pp. 62–63. But the state courts did not consider the declaration in that case because the claim was procedurally barred. Guzman argues that by presenting the declaration in his second, procedurally barred, state habeas action, he made a diligent, as opposed to negligent, effort to develop the facts underlying the claim. *Id*. This Court does not agree that filing evidence in a procedurally barred state action constitutes a diligent effort to develop the facts of a claim. *See Williams v. Taylor*, 529 U.S. 420, 437 (2000) ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."); *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) ("Submitting a new claim to the state's highest court in a procedural context in which its merits will not be considered ... does not constitute fair presentation."). Therefore, under *Ramirez*, Guzman failed to develop the factual basis of the claim in Ground 9 in state court, § 2254(e)(2) applies, Guzman does not meet the requirements of § 2254(e)(2), and this Court is barred from considering trial counsel's declaration.

The reading of § 2254(e)(2) and *Ramirez* advocated by Guzman would lead to an absurd result: to avoid the clear mandate of § 2254(e)(2) and *Ramirez*, a federal habeas petitioner could simply file a second, obviously procedurally barred, state habeas action, proffer evidence that would not be considered by the state courts, have the petition denied as procedurally barred, and then return to federal court. This would amount to nothing more than a meaningless waste of time and resources. The *Ramirez* holding cannot be read to construe § 2254(e)(2) in that manner.

At any rate, because Guzman's claim of ineffective assistance of trial counsel in Ground 9 is insubstantial, Guzman does not overcome the procedural default of the claim. The Court will deny habeas corpus relief on Ground 9 as procedurally defaulted.

### 6.    Grounds 10 and 11 – Alleged *Brady/Napue* Violations

In Ground 10, Guzman claims that his federal constitutional rights were violated because "[t]he State failed to disclose material exculpatory information regarding its key witness and allowed that witness to testify falsely." Third Amended Petition (ECF No. 55), pp. 26–30. In Ground 11, Guzman claims that his federal constitutional rights were violated on account of ineffective assistance of counsel because his trial counsel "fail[ed] to investigate and present evidence regarding whether the State extended a favorable deal to a witness." *Id.* at 30. The witness Guzman refers to in both claims is Charles Deverna ("LC").

In the ruling on Respondents' motion to dismiss, the Court determined that these claims are subject to application of the procedural default doctrine. *See* Order entered February 24, 2022 (ECF No. 74), pp. 15–17. The question, therefore, is whether Guzman can overcome the procedural default of the claims.

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls

within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

The prosecution's knowing use of "false evidence" to obtain a conviction similarly infringes on a defendant's due process rights. *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 153 ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. When a conviction is "obtained by the knowing use" of false testimony, the verdict "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

In Ground 10, Guzman claims, "on information and belief," that Deverna testified falsely when he stated that the did not "[receive] any promises or negotiations from the State in exchange for his testimony at Mr. Guzman's trial." Third Amended Petition (ECF No. 55), p. 27. Guzman describes, as follows, the circumstances that he believes imply that Deverna had a deal with the prosecution that was not disclosed to the defense, about which Deverna lied at trial:

> During the relevant time period, LC [Deverna] was facing various charges. First, LC faced charges for possession of a stolen vehicle and possession of burglary tools. The State initiated these charges on

February 2, 2011, before the shooting at issue in Mr. Guzman's case. ECF No. 14-1 (PEx. 1). Because LC had a series of prior felony convictions, he faced treatment under the "large" and "small" habitual criminal statutes, which impose higher sentencing ranges for defendants who've been convicted of multiple prior felonies. A defendant who is adjudicated under the "large" subsection faces penalties of ten to twenty-five years, life with the possibility of parole after ten years, or life without the possibility of parole. NRS 207.010(b). A defendant who is adjudicated under the "small" subsection faces a term of imprisonment of five years to twenty years. NRS 207.010(a). At the time, LC was eligible for sentencing under both subsections.

The justice court held a preliminary hearing on the charges on June 1, 2011, and it bound LC over for trial. The justice court's minutes reflect that the first district court appearance would be on June 14, 2011. ECF No. 14-2 (PEx. 2).

LC spoke to the police on June 7, 2011, the day after the incident and shortly after LC's preliminary hearing regarding these charges. LC gave a lengthy statement to the police. Toward the end of the interrogation, LC asked the police if they could "help me with my court date." ECF No. 14-6 (PEx. 6) at 84; *see also* ECF No. 24-6 (REx. 39) at 19 (Tr. at 69). The police officer said, "June 14, yeah, we could probably work on that." ECF No. 14-6 (PEx. 6) at 84. (The "June 14" date probably refers to LC's first district court appearance on these charges.) The cop asked, "they were trying to give you the big bitch or small bitch." *Id.* In other words, the police officer was asking whether the prosecution was trying to get LC sentenced under the large habitual offender statute, or the small habitual offender statute. LC answered, "Big bitch." *Id.*

The State filed an information against LC on June 13, 2011. ECF No. 14-8 (PEx. 8). The information included a notice the State was requesting sentencing under the habitual offender statutes, although it didn't specify whether the State sought treatment under the large or the small statute. *Id.* at 4.

LC ultimately pled guilty to both counts on October 27, 2011 (after LC testified at Mr. Guzman's preliminary hearing but before Mr. Guzman's trial). The guilty plea agreement suggested LC received no benefits at all in exchange for the plea. ECF No. 14-10 (PEx. 10) at 2. It explained LC faced treatment under the "large" and "small" habitual criminal statutes.

At sentencing on December 29, 2011 (after Mr. Guzman's trial), the prosecutor asked the trial court to sentence LC under the small habitual criminal statute, not the large habitual criminal statute (ECF No. 14-13 (PEx. 13) at 4)—even though LC told the police the prosecution originally wanted him sentenced under the large statute (ECF No. 14-6 (PEx. 6) at 84). The trial court agreed not to adjudicate LC as a large habitual offender and imposed a total sentence of five years to twelve-and-a-half years. ECF No. 14-13 (PEx. 13) at 7.

Second, LC faced a charge for possession of a dangerous weapon, which he picked up only a month before the shooting, on May 6, 2011. ECF No. 14-3 (PEx. 3); ECF No. 14-4 (PEx. 4). He resolved this charge by pleading guilty to disorderly conduct on November 1, 2011 (between

1    Mr. Guzman's preliminary hearing and his trial). LC received a 120-day
     sentence. ECF No. 14-3 (PEx. 3).

2         Third, LC faced a new charge on July 6, 2011, for unlawful
3    possession of drug paraphernalia; the State ultimately declined
     prosecution. ECF No. 15-15 (PEx. 31) (case no. PC11M30335X).

4         Fourth, LC wasn't arrested for any crimes in relation to the
5    shooting, even though he'd likely been in possession of stolen property
     and was smoking meth that morning, had potentially been involved in
6    Tony's plot to attack Mr. Guzman, and had endangered his son Nathan,
     among other things. *See* ECF No. 24-23 (REx. 56) at 196, 213. He also
7    wasn't arrested after he spoke to the police the day after the shooting,
     even though he had outstanding warrants at the time. *See* ECF No. 14-3
8    (PEx. 3) (bench warrant issued May 10, 2011). On information and belief,
     he also didn't lose custody of his son.

9    *Id*. at 27–29.

10        So, Guzman points to the State's alleged lenient treatment of Deverna with

11   respect to various criminal charges and argues that the alleged lenient treatment implies

12   that Deverna had some deal with the State regarding his testimony in Guzman's case.

13   This is, at best, circumstantial evidence of a violation of Deverna's rights under *Brady*,

14   *Giglio*, and *Napue*, and it is not strong circumstantial evidence at that. Deverna does not

15   show it to be unusual—and it is not surprising to this Court—that Deverna would receive

16   some benefit for entering plea agreements to resolve charges of possession of a stolen

17   vehicle, possession of burglary tools, and possession of a dangerous weapon, and that

18   he would not be prosecuted on charges of possession of drug paraphernalia or on

19   charges for crimes that Guzman believes he committed in the course of the events

20   underlying this case. Guzman proffers no direct evidence of any deal between Deverna

21   and the State, and he does not proffer any evidence showing what the terms of any

22   such deal were, how Deverna's testimony may have been affected, or how Guzman

23   was prejudiced. So, even if the Court considers on their merits Guzman's claims as

24   presented in this Court, the Court finds them to be speculative and insubstantial.

25        Furthermore, even if the Court were to consider the circumstantial evidence

26   presented by Guzman to be of some weight, Guzman does not show cause and

27   prejudice relative to the procedural default of the *Brady* claim in Ground 10. This is

28   because Guzman does not claim that circumstantial evidence—the circumstances

regarding the resolution of the various criminal charges against Deverna, as described in Guzman's third amended petition—was withheld from him by the State, preventing him from asserting this claim in his first state habeas action. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("[A] petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence…."); *Paradis v. Arave*, 130 F.3d 385, 393 (1997) ("In order to establish cause for this successive claim, Paradis must show that he could not have known of it during his first habeas petition."). Stated differently, to the extent Guzman now asserts in Ground 10 a claim based on *Brady*, *Giglio*, and *Napue*, he could have done the same in his first state habeas action. Guzman points to no evidence hidden by the State and only discovered by him after the completion of his first state habeas action, revealing the existence of this claim. Guzman makes no showing that any nondisclosure by the State was the cause of his failure to assert this claim in his first state habeas action. And furthermore, because Guzman has no evidence of the nature of any alleged deal between Deverna and the State, Guzman does not show prejudice relative to the procedural default.

Similarly, regarding the procedural default of the claim of ineffective assistance of trial counsel in Ground 11, even considering the circumstantial evidence presented by Guzman, finding that evidence to be weak, the Court determines that the claim is insubstantial, and that Guzman cannot show that his counsel in his first state habeas action was ineffective for not asserting the claim or that he was prejudiced. So, Guzman does not show cause and prejudice under *Martinez* relative to the procedural default of the claim in Ground 11.

Moreover, as with the claim in Ground 9, under *Ramirez*, this Court is not to consider the circumstantial evidence that Guzman claims shows there to have been a deal between Deverna and the State. Guzman failed to assert the claims in Grounds 10 and 11 in his first state habeas action, and therefore did not present his circumstantial evidence in support of those claims in that case. It was because Guzman failed to raise

these claims in his first state habeas action that his second state habeas action was ruled procedurally barred. *See* Order of Affirmance, Exh. 53, pp. 2–3 (ECF No. 48-17, pp. 3–4). Therefore, under *Ramirez*, § 2254(e)(2) applies, Guzman does not satisfy the requirements of § 2254(e)(2), and this Court is barred from considering the evidence presented by Guzman in support of those claims and in support of his arguments that he can overcome the procedural default of the claims.

The Court will deny the claims in Grounds 10 and 11 as procedurally defaulted.

**C.     Guzman's Motions for Discovery and Evidentiary Hearing**

Guzman filed a motion requesting leave of court to conduct discovery (ECF No. 93) and a motion requesting an evidentiary hearing (ECF No. 94). The parties have fully briefed those motions (ECF Nos. 98, 99, 103, 104). Guzman requests leave of court to conduct discovery regarding Grounds 9, 10 and 11, and he requests an evidentiary hearing on Grounds 1, 2B, 3, 4, 5, 6A, 7, 8, 9, 10 and 11. The Court will deny Guzman's motions.

As is explained in Part III.B.5, above, the Court determines that, with respect to the claims denied as procedurally defaulted in this order, evidentiary development is unwarranted, under 28 U.S.C. § 2254(e)(2) and *Ramirez*, because Guzman failed to develop the factual bases of the claims in state court and he does not satisfy the requirements of that statute for development of evidence in this federal habeas action. *See Ramirez*, 142 S. Ct. at 1734–35. Indeed, Guzman does not make any argument at all that he can meet the requirements of § 2254(e)(2) for admissibility of any evidence he seeks to develop. *See* Motion for Leave to Conduct Discovery (ECF No. 93), Motion for Evidentiary Hearing (ECF No. 92), Reply in Support of Motion for Leave to Conduct Discovery (ECF No. 104), and Reply in Support of Motion for Evidentiary Hearing (ECF No. 103) (making only the argument that § 2254(e)(2) does not apply because Guzman made a diligent effort to develop the evidence in his second state habeas action, an argument rejected by this Court, above).

With respect to claims denied on their merits in state court, and denied on their merits in this order, this federal habeas court is not to consider evidence that was not presented in state court. *Pinholster*, 563 U.S. at 180 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *see also Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on *de novo* review, subject to the limitations of § 2254(e)(2).").

Therefore, this Court determines that there is no showing by Guzman that any of the evidentiary development he requests would lead to evidence that this Court could consider in this federal habeas corpus action. *See Shoop v. Twyford*, 596 U.S. 811, 822–24 (2022) (holding that evidentiary development should have been denied by the district court where the habeas petitioner did not demonstrate that the evidence to be developed would be admissible). The Court will deny Guzman's motions.

### D.    Certificate of Appealability

For a certificate of appealability ("COA") to issue, a habeas petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). Additionally, where the district court denies a habeas claim on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*; *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). Applying these standards, the Court finds that a certificate of appealability is unwarranted.

**IV.    Orders**

**IT IS THEREFORE ORDERED** that Petitioner's Motion for Leave to Conduct Discovery (ECF No. 93) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Motion for an Evidentiary Hearing (ECF No. 94) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Third Amended Petition for Writ of Habeas Corpus (ECF No. 55) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly and close this case.

DATED THIS 10th day of January, 2024.

HOWARD D. MCKIBBEN
UNITED STATES DISTRICT JUDGE